No. 15-16069

# UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

---

STEVEN INGRAM
*Plaintiff-Appellant*

v

PACIFIC GAS & ELECTRIC COMPANY, *et. al.*
*Defendants-Appellees*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

CIVIL CASE NO. 3:12-cv-02777-JST

---

AMENDED APPELLANT'S OPENING BRIEF

---

ADVOCATES FOR APPELLANT

SMITH PATTEN
SPENCER F. SMITH, ESQ. (SBN 236587)
DOW W. PATTEN, ESQ. (SBN 135931)
221 Main Street, Suite 740
San Francisco, California 94105
Telephone 415-402-0084
Facsimile 415-520-0104

## **TABLE OF CONTENTS**

TABLE OF CONTENTS.................................................................................i

TABLE OF AUTHORITIES.......................................................................iv

I.     INTRODUCTION...................................................................1

II.    STATEMENT OF JURISDICTION...................................1

III.   STATEMENT OF ISSUES...................................................2

IV.   STATEMENT OF THE CASE.............................................3

      A.    STATEMENT OF FACTS................................................3

            1.    PG&E's Disciplinary Policies and Procedures..........................3

                 a.    PG&E's Discipline Policies and Procedures Related to Switching Errors..............................3

                 b.    PG&E's Discipline Policies and Procedures Related to Driving License Issues.......................5

            2.    Ingram's Employment and Discipline History..........................6

            3.    Gankin's Alleged Prejudice......................................13

            4.    Disciplinary Actions Against Other Employees......................13

      B.    RELEVANT PROCEDURAL HISTORY.........................................14

            1.    PG&E's Discovery Misconduct..............................15

                 a.    PG&E Obstructs Fact Discovery of Comparator Evidence Throughout the Litigation..............................15

b.      Example of PG&E's Evasive Discovery Conduct at the Depositions of Gankin and Bonnett..........................17

V.      SUMMARY OF THE ARGUMENT.............................................................19

VI.     LAW & ARGUMENT.......................................................................20

A.      STANDARD OF REVIEW..................................................20

B.      INGRAM PRESENTED TRIABLE ISSUES OF MATERIAL FACT AS TO HIS RACE DISCRIMINATION CLAIM.................22

1.      The *McDonnell Douglas* Burden-Shifting Evidentiary Standard is Flexible....................................................23

2.      This Court Should Overrule the Authority Upon Which the District Court Conflated Ingram's Evidentiary Burdens at Summary Judgment....................................................25

3.      There is a Triable Issue of Material Fact Whether Ingram Performed His Job Satisfactorily................................27

4.      There is a Triable Issue of Material Fact Whether PG&E Treated Ingram Differently than Similarly Situated Employees Outside of His Protected Class...............................31

5.      There is a Triable Issue of Material Fact as to Pretext.............34

a.      Ingram Personally Observed Gankin Disparately Punish African-American Co-Workers...........................35

b.      Only African-Americans Were Terminated for Switching.......................................................36

c.      All African-American Electricians at the Martin Substation Were Placed on DMLs or Terminated.........36

ii

d. No Positive Recognitions Given to African-American Employees by Gankin.....................................38

e. Multiple Complaints of Race Discrimination at Martin Substation...........................................38

f. Caucasian Placed on DML Reduced by Positive Recognitions Denied to African-Americans...................41

g. Corporate Security and EEO Investigations of Race Harassment..............................................41

h. No Co-Workers Disciplined For Drivers License Issues...................................................42

i. PG&E Did Not Follow Its Own Procedures..................42

6. The District Court Engaged in Impermissible Credibility Determinations...........................................43

a. Gankin's Evasive Testimony Regarding His Knowledge of Race in Discipline At Martin Substation...................43

b. Bonnett's Evasive Testimony Regarding His Knowledge of the Pattern of Race Based Disciplines In Conjunction With Plaintiff's Substantial and Specific Circumstantial Evidence Dictates a Trial On the Merits.......................45

C. THE DISTRICT COURT SHOULD HAVE MADE AN ADVERSE INFERENCE BECAUSE OF PG&E'S DISCOVERY MISCONDUCT...................................................47

VII. CONCLUSION...................................................50

iii

# <u>TABLE OF AUTHORITIES</u>

## UNITED STATES SUPREME COURT CASES

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)............................................................20-21, 31

*Furnco Constr. Corp. v. Waters*,
    438 U.S. 567 (1978)...................................................................23

*Johnson v. Transp. Agency*,
    480 U.S. 616 (1987)...................................................................23

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973)...........................................................22-23, 24

*Patterson v. McLean Credit Union*,
    491 U.S. 164 (1989)...................................................................23

*Reeves v. Sanderson Plumbing Prods.*,
    530 U.S. 133 (2000)..........................................................20, 21, 31

*Sprint/United Management Co. v. Mendelsohn*,
    552 U.S. 379 (2008)...............................................................40-41

*Swierkiewicz v. Sorema N.A.*,
    534 U.S. 506 (2002)...................................................................23

*St. Mary's Honor Ctr. v. Hicks*,
    509 U.S. 502, 515 (1993)............................................................35

*Texas Dep't of Cmty. Affairs v. Burdine*,
    450 U.S. 248 (1981)...............................................................34-35

*TWA v. Thurston*,
    469 U.S. 111 (1985)...................................................................35

*U.S. Postal Service Bd of Governors v. Aikens*,
    460 U.S. 711 (1983)....................................................................22

## COURT OF APPEALS CASES

*Anderson v. Hodel*,
    899 F.2d 766 (9th Cir. 1990)........................................................20

*Aragon v. Republic Silver State Disposal, Inc.*,
    292 F.3d 654 (9th Cir. 2002)................................................25-26 27, 29, 34

*Beck v. UFCW, Local 99*,
    506 F.3d 874 (9th Cir. 2007)....................................................31-32

*Carver v. Holder*,
    606 F.3d 690 (9th Cir. 2010)........................................................20

*Chuang v. Univ. of Cal. Davis*,
    225 F.3d 1115 (9th Cir. 2000)......................................................25

*Coghlan v. Am. Seafoods Co.*,
    413 F.3d 1090 (9th Cir. 2005)......................................................43

*Cornwell v. Electra Cent. Credit Union*,
    439 F.3d 1018 (9th Cir.2006)...............................................22-23, 24

*Costa v. Desert Palace*,
    299 F.3d 838 (9th Cir. 2002)....................................................24-25

*Curry v. Menard, Inc.*,
    270 F.3d 473 (7th Cir. 2001)........................................................28

*Davenport v. Riverview Gardens Sch. Dist.*,
    30 F.3d 940 (8th Cir. 1994)..........................................................29

*Diaz v. Eagle Produce, Ltd.*,
    521 F.3d 1201 (9th Cir. 2008)......................................................30

*Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate*,
    470 F.3d 827 (9th Cir. 2006)..........................................................23

*Douglas v. Anderson*,
    656 F.2d 528 (9th Cir.1981).............................................25, 26-27

*Earl v. Nielsen Media Research, Inc.*,
    658 F.3d 1108 (9th Cir. 2011)......................................................23

*Flores v. Preferred Technical Group*,
    182 F.3d 512 (7th Cir. 1999).........................................................28

*Forest Hills Early Learning Ctr., Inc. v. Lukhard*,
    728 F.2d 230 (4th Cir. 1984).........................................................48

*Godwin v. Hunt Wesson, Inc.*,
    150 F.3d 1217 (9th Cir. 1998)......................................................24

*Hawn v. Exec. Jet Mgmt.*,
    615 F.3d 1151 (9th Cir. 2010)...................................26, 27, 29, 31

*Heyne v. Caruso*,
    69 F.3d 1475 (9th Cir 1995).........................................................41

*Hollander v. Am. Cyanamid Co.*,
    895 F.2d 80 (2d Cir. 1990)...........................................................22

*Kronisch v. United States*,
    150 F.3d 112 (2d Cir. 1998).........................................................49

*Lam v. University of Hawaii*,
    40 F.3d 1551 (9th Cir. 1994)........................................................21

*Lynn v. Regents of the Univ. of Cal.*,
    656 F.2d 1337 (9th Cir. 1981)......................................................26

*McGinest v. GTE Serv. Corp.*,
 360 F.3d 1103 (9th Cir. 2004)...............................................................24-25

*McGuinness v. Lincoln Hall*,
 263 F.3d 49 (2d Cir. 2001)...........................................................................32

*Moran v. Selig*,
 447 F.3d 748 (9th Cir. 2006).................................................................31-32

*Obrey v. Johnson*,
 400 F.3d 691 (9th Cir. 2005).......................................................................41

*Oest v. Illinois Dept. of Corrections*,
 240 F.3d 605 (7th Cir. 2001).......................................................................28

*Peele v. Country Mut. Ins. Co.*,
 288 F.3d 319 (7th Cir. 2002)..................................................................28, 29

*Perez v. Thorntons, Inc.*,
 731 F.3d 699 (7th Cir. 2013).......................................................................28

*Residential Funding Corp. v. Degeorge Financial Corp.*,
 306 F.3d 99 (2d Cir. 2002)......................................................................49-50

*Rosen v. Thornburgh*,
 928 F.2d 528 (2nd Cir. 1991).......................................................................22

*Safe Flight Instrument Corp. v. McDonnell-Douglas Corp.*,
 482 F.2d 1086 (9th Cir. 1973).....................................................................20

*Schnidrig v. Columbia Mach.*,
 80 F.3d 1406 (9th Cir. 1996).......................................................................21

*Taybron v. City & County of San Francisco*,
 341 F.3d 957 (9th Cir. 2003).................................................................21, 43

vii

*Vasquez v. Cty. of L.A.*,
349 F.3d 634 (9th Cir. 2003)........................................................32

*Veillon v. Exploration Servs., Inc.*,
876 F.2d 1197 (5th Cir. 1989)......................................................48

*Wall v. Nat'l R. Passenger Corp.*,
718 F.2d 906 (9th Cir. 1983)........................................................34

*Wallis v. J.R. Simplot Co.*,
26 F.3d 885 (9th Cir. 1994)..........................................................25

*Warren v. City of Carlsbad*,
58 F.3d 439 (9th Cir. 1995)......................................................21-22

## DISTRICT COURT CASES

*Bahri v. Home Depot USA, Inc.*,
242 F. Supp. 2d 922 (D. Or. 2002).............................................27-28

*Bowden v. Potter*,
308 F. Supp. 2D 1108 (N.D. Cal. 2004).......................................32-33

*Flores v. Kelley*,
61 F.R.D. 442 (N.D. Ind. 1973)....................................................48

*In re Franklin Nat'l Bank Sec. Litig.*,
478 F. Supp. 210 (E.D.N.Y. 1979)................................................48

*Jackson v. Foodland Super Mkt., Ltd.*,
958 F. Supp. 2d 1133 (D. Haw. 2013)......................................30, 31

*John Blair & Co.v. Walton*,
47 F.R.D. 196 (D. Del. 1969)....................................................47-48

*Nelson v. A. H. Robins Co.*,
    515 F. Supp. 623 (N.D. Cal. 1981)..............................................................20

*Pascual v. Astrue*,
    2009 U.S. Dist. LEXIS 35936 (N.D. Cal. Apr. 24, 2009)...........................31

## STATE CASES

*Artega v. Brink's, Inc.*,
    163 Cal. App. 4th 32 (2008)........................................................................43

## UNITED STATES CODE

28 U.S.C. § 1291............................................................................................2

28 U.S.C. § 1331............................................................................................2

28 U.S.C. § 1367............................................................................................2

42 U.S.C. § 2000e, *et seq*............................................................................1-2

42 U.S.C. § 2000e-2(a)(1)............................................................................22

42 U.S.C. § 2000e-5(f)(3)...............................................................................2

## FEDERAL RULES

Fed. R. App. P. 4(a)(1)(A)..............................................................................2

Fed. R. Civ. P. 30(b)(6).........................................................................16, 36

Fed. R. Civ. P. 56(a).....................................................................................20

Fed. R. Civ. P. 56(d).........................................................................14, 15, 16

## I.    INTRODUCTION

This appeal concerns whether it is lawful for an African-American employee to be disciplined more severely than his non-African-American co-workers for infractions of comparable gravamen, despite having an imperfect work record.  On June 29, 2011, Steven Ingram ("Appellant" or "Ingram") was terminated from his Substation Maintenance Electrician position with the Pacific Gas & Electric Company ("Appellee" or "PG&E") allegedly due to a switching error that caused an outage and issues relating to his driver's license.

Throughout the litigation, PG&E's counsel continuously obstructed fact discovery into Ingram's comparators even after a successful motion to compel. Notwithstanding, the summary judgment record reflected triable issues of material fact that PG&E considered race in disparately punishing and later terminating Ingram.  Rather than issuing adverse inferences, the District Court granted summary judgment to PG&E by conflating Ingram's *prima facie* and pretext evidentiary burdens, and by making impermissible credibility determinations.  This appeal follows.

## II.    STATEMENT OF JURISDICTION

The District Court had federal question jurisdiction over Ingram's claims arising under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C.

§ 2000e, *et seq*., as amended, pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3). The District Court had subject matter jurisdiction over Ingram's remaining state law claims pursuant to 28 U.S.C. § 1367. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

On April 13, 2015, the District Court granted summary judgment to PG&E (EOR 004-020), and entered judgment on April 28, 2015. (EOR 003). Ingram timely filed a Notice of Appeal on May 27, 2015. *See* Fed. R. App. P. 4(a)(1)(A).

## III. STATEMENT OF ISSUES

1. Whether the District Court committed reversible error by dismissing Ingram's Title VII Race Discrimination claim as a matter of law at summary judgment even though triable issues of material fact existed as to whether he performed his job satisfactorily, and whether PG&E disciplined him more severely than his non-African-American co-workers for infractions of comparable gravamen?

2. Whether the District Court committed reversible error by not issuing adverse inferences against PG&E for the prolonged and well-documented discovery abuse of its counsel throughout the discovery process?

## IV.  STATEMENT OF THE CASE

### A.  STATEMENT OF FACTS[1]

#### 1.  PG&E's Disciplinary Policies and Procedures

PG&E's positive discipline policy has three categories of employee

discipline: work performance, conduct, and attendance.  (EOR 455).  For each

category, PG&E implements a progressive discipline system.  (EOR 459).  Under

this positive discipline system governed by the collective bargaining agreement

("CBA"), there are three progressive steps to discipline: oral reminder, written

reminder, and decision-making leave ("DML").  (*Id*.; EOR 403).  PG&E also

utilizes crisis suspensions "when an employee is performing one of the functions

and making mistakes."  (EOR 411-412).  An oral reminder remains active for six

months.  (EOR 266).  Similarly, if an employee receives a written reminder, it

remains active for 12 months.  (EOR 264).  After an employee receives a written

reminder, a subsequent incident is likely to lead to a DML at least.  (EOR 263).

##### a.  PG&E's Discipline Policies and Procedures Related to Switching Errors

A switch is high voltage mechanical electrical equipment used to route

electrical current.  A Substation Maintenance Electrician at PG&E, when

performing a switching operation, uses a switching log, similar to a checklist, that

---

1  As the record reflects, Ingram incorporates the facts from each of his three
summary judgment oppositions filed in this matter.  (EOR 335; EOR 35, 50).

the switchman fills out while performing the switch. (EOR 394). During this procedure, the switchman needs to indicate on the switching log that he performed each duty correctly. (EOR 394-395). Switching errors are common at PG&E and usually result in a written reminder, or less. (EOR 289).

In 2008, of the disciplines grieved to the union representing electrical workers ("IBEW"), there were approximately six disciplines issued for performance errors, excluding Ingram. (*See* EOR 310, 311, 286-287, 288, 282, 290, 281, 283, 284-285, 291). Of the approximately six disciplines issued for performance errors, three were initially issued as DMLs and three were issued as written reminders. (*Id*.) In 2009, of the disciplines grieved to IBEW, approximately six of them had been issued for performance errors. (*See* EOR 316, 315, 300, 317, 318, 320-321, 319, 314, 322, 323, 292-294, 296). Of the approximately six disciplines issued for performance errors, four were initially issued as DMLs and two were issued as written reminders. (*Id*.) In 2010, of the disciplines grieved to IBEW, approximately five of them were issued for performance errors. (EOR 297-299, 301-309, 312-313). Of the approximately five disciplines issued for performance errors, one was initially issued as a DML, two were issued as written reminders, and two were issued as oral reminders. (*Id*.) In 2011, of the disciplines grieved, only one was issued for a performance error and it

belonged to Ingram, who was subsequently terminated.

###    b.    PG&E's Discipline Policies and Procedures Related to Driving License Issues

Over the past decade, PG&E has operated under a policy whereby an employee with a suspended, revoked, or expired driving license would be accommodated with assignments that did not require driving.  For example, Ingram's lead supervisor, Ed Bonnett ("Bonnett"), had an invalid drivers license for approximately six months while working as a Substation Electrician and was allowed to keep his job.  (EOR 445-446).

PG&E's alleged procedure for employees reporting an invalid driver's license was allegedly communicated to them through daily tailboard meetings hosted by the Local Supervisors.  (EOR 448-449, 452).  As a lead supervisor, Bonnett attended the daily tailboard meetings from 2009 to 2011 but did not recall one tailboard meeting where a local supervisor reviewed the driving expectations or code of conduct with the staff.  (EOR 450-451).  Bonnett testified that the substation maintenance employees are only required to have a driver's license to drive a company vehicle, not to perform their substation maintenance duties. (EOR 466-467).  Ingram's supervisor, Boris Gankin ("Gankin"), testified that he could not remember what documents he reviewed which stated that Substation Maintenance Electricians were required to have a California license to require their

5

job duties.  (EOR 407-408).

Ingram testified as to his knowledge of other PG&E employees losing their driving privileges, like Chris Hackworth, and being given the opportunity by PG&E to get picked up from his house on a daily basis.  (EOR 388).

Ingram also testified that until his termination, he was unaware that his license had expired or been revoked:  "I cannot tell, inform, my employer something I'm not aware of.  So the reason I didn't tell them -- I didn't tell them that my license was revoked and expired because at the time I didn't realize that it was revoked and expired."  (EOR 390).

According to an e-mail sent by PG&E Human Resources Advisor Michelle Lee ("Lee"), dated May 20, 2011, she could only find one example of a Fresno employee who was terminated for driving on a suspended license.  This employee "lied to the supervisor on several occasions about his license status."  According to Lee, PG&E "did terminate and EE did not grieve so no precedent setting decision on it."  (EOR 278).  During discovery, PG&E produced no evidence of any other discipline issued by PG&E to a switchman based on loss of driving privileges.

### 2.    Ingram's Employment and Discipline History

On or around April 15, 2003, Ingram began working for PG&E as a Utility Worker in General Construction at the Construction Station in San Mateo,

California. (EOR 268). Over the next eight years, he would only have three performance errors, despite the high rate of malfunctioning of old and outdated equipment.[2] Ingram was never disciplined during his first five years of employment.

Despite five years of service with no record of discipline, in 2008, he began to report to Gankin and Bonnett. Ingram testified that Gankin was often inappropriate and condescending towards minority employees. (EOR 382-384). Ingram believed that Gankin harbored racial bias towards African-Americans because of this and "the fact that all the other African Americans in the shop were either on DML, or under some form of disciplinary action, or terminated." (EOR 385-386). During the time that he reported to Gankin, Ingram witnessed him "go above and beyond to give you the most severe disciplinary action that you could possibly get with African Americans." (EOR 386).

On March 4, 2009, Steve Watson ("Watson") recognized Ingram's good work performance. Specifically, for February 2009, Ingram completed nine Station Inspections without an error or mistake, for which Watson rewarded him with a $25.00 Reward and Recognition for doing such a good job. Watson went on

---

2 Ingram was later hired as a high voltage electrician at Moffet Field with IAP World Services, a government contractor that provides logistical services for military bases and other government projects globally. (EOR 380-381).

to thank Ingram for his outstanding performance. (EOR 267).[3]

From 2008 until his termination, Ingram was disciplined by Gankin and Bonnett 11 times: six times for driving infractions, three times for performance errors, one time for insubordination, and one time for attendance. Bonnett testified Ingram was involved in a motor vehicle accident in 2011 while stopping to get lunch.[4] (EOR 461-464, 126, 127-146). Following the accident, PG&E interviewed Ingram as part of the investigation to see which party was at fault. Upon investigation, it was discovered that the party at fault was the third party who hit him. (EOR 463-464). Bonnett testified he could not recall if anyone confirmed or denied that Ingram had a valid license, nor whether he exchanged information with the third party following the incident. (EOR 465). During each of the two motor vehicle accidents in 2008 and 2010, Ingram was required to provide of copy of his driver's license to PG&E as part of the positive discipline process and no one at PG&E informed him of any issues with his license at that time. (EOR 475).

In April 24, 2011, Ingram was arrested on suspicion of driving under the

3  This is the only performance evaluation Ingram received while working at Martin Substation. Bonnett testified that performance evaluations were not issued annually, and are only given by supervisors to their employees as they feel appropriate. (EOR 460). Ingram scored at 92% on the Substation Switching courses in 2010 and received the highest score a perfect 100% on the Substation Switching courses in 2011. (EOR 148).

4  Company documents demonstrate this incident occurred on February 18, 2010. (EOR 262).

8

influence.  On May 10, 2011, Gankin conducted a driving observation with him.

(EOR 434-435).  Gankin claimed that prior to May 10, 2011, he was unaware of

any issues with Ingram's driver's license.  (EOR 436-437)[5].  Ingram testified that

prior to his termination, he was not aware of any restrictions on his license.  (EOR

389).[6]

Gankin testified that once he became aware of an issue with Ingram's

license, he told Ingram that he could not drive company vehicles until he could

show Gankin his driver's license.  (EOR 409).  Gankin testified that he told Ingram

that he could find him an assignment for that day that did not require a license and

that Ingram could bring his license the next day.  (*Id*.).  Gankin testified that

Ingram did environmental cleanup at Martin Substation or was at the office that

day instead of driving.  (*Id*.).  Gankin testified that for the remainder of May,

Ingram did other assignments, including safety observation work and functional

testing at Martin.  Functional testing did not not require Ingram to operate a PG&E

vehicle.  (EOR 387).  On May 17, 2011, Ingram put a copy of his temporary

license in Gankin's mailbox, as requested by Gankin. (EOR 478).

5  On Gankin's return for deposition, he could not recall performing driving
observations each year for the other employees he supervised.  (EOR 230-231).

6  Michelle Lee from PG&E Labor Relations testified that Ingram repeatedly
informed PG&E that his license was valid and that Lee was the one who instructed
Gankin to instruct Plaintiff to provide proof of a license from the DMV.  (EOR
245-246).

On May 17, 2011, Ingram was assigned a very complex switching procedure, containing hundreds of individual steps, and simultaneously ordered to train a fellow PG&E employee, Mike Rice ("Rice"), on a procedure Ingram had never performed previously. Ingram testified that Rice was accompanying him as a Provisional Electrician and that on a switching procedure of such high complexity and risk, it was customary to assign another electrician who had performed the switching previously, not an inexperienced Provisional Electrician such as Rice. (EOR 391, 392). Gankin testified that Rice was assigned to work with Ingram to observe the process of performing a functional test and drive Ingram to the location of the functional test.[7] (EOR 421-422). Gankin testified that he assigned Rice to observe Ingram because Ingram was a qualified Substation Maintenance Electrician who could perform this functional test and Rice was a Provisional Electrician who could gain knowledge from observing Ingram. (EOR 423-424).

---

7 Gankin testified that a functional test is operating the circuit breaker, minimum three times, making sure its open and closed properly and it would need to be performed because it is a maintenance procedure making sure the equipment is reliable. (EOR 427). If a breaker opens, it results in the circuit causing an outage. (EOR 428). It is possible for a circuit breaker to open and result in no outage to customers. (EOR 429). Gankin testified that if there is a functional test, a circuit breaker can open and could result in no outage. (EOR 429-430). Gankin testified that when the breaker is de-energized and isolated from the electrical system, a breaker can open without it resulting in an outage. (EOR 430). Gankin testified that he does not know if anyone at PG&E can confirm whether or not any customers lost power as a result of Ingram's work performance error. (EOR 431).

Ingram testified that he had never previously performed the switch on that particular circuit at that station. (EOR 393). Ingram testified that the switch he was assigned to work on was a 60-year-old breaker that was poorly documented and maintained. (SEOR 142-143). During the investigation into Ingram's switching error, it was discovered that Operation # 70, performed during the functional test, was missed in the switching log. (EOR 396-397). Ingram testified that Step # 70 is done after the completion functional performance test, which was to be performed after Step # 63. (SEOR 142-143). Ingram testified that he and Rice were set to bring the circuit breaker back in service, but it did not fully close. (*Id.*). Ingram testified that the old equipment malfunctioned a bit and threw them off, causing their delay. (*Id.*). Rather than work unapproved overtime on the issue, for which Gankin had terminated Ingram's African-American co-worker, Louis Tinsley ("Tinsley"), Ingram attempted to immediately fix the issue.[8] At the time of

---

8 Ingram testified that "it was a conflicting kind of deal" whether he was told that he had to stop in the middle of a procedure like a switch if it could not be completed without overtime hours. Ingram testified that past issues arose regarding creating one's own overtime hours. Ingram testified that one day, two African-American electricians from his department were switching when a problem occurred, and they stayed on a couple extra hours. Ingram testified that the employees thought what they did what was right. Ingram testified that the DO had even told them to stay, but they were written up anyway because they had not contacted Bonnett or Gankin, even though they had tried to call Gankin, but it was a weekend and he did not answer his phone. Ingram testified that with this in mind, he thought he had to get finish the job without requesting overtime, or else he would be written up. (SEOR 140-142).

his performance error, Ingram did not have an active coaching and counseling. (EOR 425-426).

On May 18, 2011, Diane Harris ("Harris"), PG&E's Human Resources advisor, wrote an e-mail to Gankin and Bonnett providing them with Ingram's online driving record stating, "Looks like your boy hasn't had a license in a while.... d." (EOR 271-272). On May 19, 2011, Gankin placed Ingram on "Crisis suspension", allegedly due to unavailability of his driver's license. (EOR 438, 269-270). The same day, Gankin sent an e-mail to an unidentified person, stating: "By the way, Steve said that this is a discrimination." (EOR 273).

On May 21, 2011, Gankin sent an e-mail to his superintendent, Michael Lewis ("Lewis"), informing him of his alleged discovery that Ingram did not have a valid driver's license during his driving observation. (EOR 432-434). Gankin was responsible for interviewing Ingram during his investigation regarding his driver's license. (EOR 440). During the investigation into Ingram's driver's license, when asked whom he notified of the change in status of his license, Ingram responded that he was not aware of any changes to his driver's license. (EOR 441).

On June 29, 2011, Ingram was terminated for failing to previously notify PG&E that he had lost his driver's license and for the switching error. (EOR 444-445).

Gankin does recall having one other previous discussions with Bonnett regarding placing an employee on crisis suspension. (EOR 439).

### 3. Gankin's Alleged Prejudice

Gankin, a foreign-born immigrant to the United States, admitted in deposition that he was unfamiliar with Title VII's or the California Fair Employment and Housing Act's ("FEHA") prohibitions against discrimination in the workplace. (EOR 400-402, 419). When Gankin arrived at Martin Substation in 2006, there were three veteran African-American Substation Maintenance Electricians. When Ingram arrived two years later, the total was four African-Americans. By 2011, every one of the African-Americans were either on DMLs or terminated, and by 2013 no African-American electricians remained under Gankin's supervision.

### 4. Disciplinary Actions Against Other Employees

Despite the fact that PG&E refused to provide numerical identifiers or the races for any of the redacted documents PG&E produced, IBEW documents made it clear that DMLs are extremely rare at PG&E. Despite employing in excess of 20,000 people in Area 1, PG&E issued only approximately 53 DMLs since 2008. Bonnett testified that within his eight-year tenure as lead supervisor, somewhere between five and ten employees under his supervision had been placed on DMLs.

13

(EOR 457).  Bonnett testified that of these employees, approximately four were

terminated, including Ingram.  However, when Bonnett was questioned regarding

the identities of the individuals, including their race, Bonnett was instructed not to

answer by PG&E's counsel.  (*See* EOR 453-454).

Based upon IBEW documents, only two electricians have been terminated

for switching errors from 2007-2011: Tinsley and Ingram.  Both of them are

African-Americans who reported to Gankin at the time of their terminations.  To

obtain this very basic information, Ingram was forced to bring multiple motions in

the District Court.  (*See* EOR 370).

## B.    RELEVANT PROCEDURAL HISTORY

On May 31, 2012, Ingram filed the operative Complaint, alleging six claims:

(1) Race Discrimination (Title VII); (2) Harassment (Title VII); (3) Retaliation

(Title VII); (4) Wrongful Termination in Violation of Public Policy; (5)

Harassment (FEHA); (6) Retaliation (FEHA).  (EOR 522).

On August 23, 2013, PG&E initially moved for summary judgment.  (EOR

480), which Ingram opposed.  (EOR 324-359).  On September 30, 2013, the

District Court deferred summary judgment pursuant to Fed. R. Civ. P. 56(d).

(EOR 259-260).

On March 17, 2014, Ingram filed a supplemental opposition to PG&E's first

14

motion for summary judgment. (EOR 214-224). On April 28, 2014, the District Court granted a second Fed. R. Civ. P. 56(d) continuance. (EOR 195-198).

On January 23, 2015, PG&E filed a second motion for summary judgment. (EOR 158-194). Ingram filed his opposition on February 27, 2015. (EOR 31-50). The District Court granted summary judgment to PG&E on April 13, 2015 (EOR 4-20), and entered judgment on April 28, 2015. (EOR 3).

## 1. PG&E's Discovery Misconduct

The context of this litigation would be incomplete without an understanding of PG&E's discovery misconduct. Since October 2012, Ingram had attempted to obtain evidence regarding a pattern of racially-motivated discipline at Martin Substation and evidence that the decision-makers were aware of this pattern of utilizing race as a factor in disciplines. Even while granting summary judgment to PG&E, the District Court ruled that its "discovery misconduct" and "unnecessary prolonging of this litigation" warranted denial of any right to a cost award. (EOR 3).

### a. PG&E Obstructs Fact Discovery of Comparator Evidence Throughout the Litigation.

On September 6, 2013, Ingram requested a continuance of PG&E's first motion for summary judgment, in part, based upon Fed. R. Civ. P. 56(d). (EOR 360, 376). Ingram informed the District Court in his Opposition that PG&E's

gamesmanship in discovery obstructed the administration of justice and would

preclude a decision on the merits.  At the October 13, 2013 hearing, Ingram's

counsel informed the District Court that Ingram would like to cross-examine the

decision-makers about the circumstances surrounding the disciplines issued at

Martin Substation (EOR 256-257), and to obtain the underlying documents and

communications concerning the disciplines, not just the truncated log of those

disciplines.  (EOR 257-258; SEOR 136).

On March 24, 2014, PG&E's continuous obstructionism again compelled

Ingram to seek Fed. R. Civ. P. 56(d) relief.  (EOR 199-213).  The District Court

ordered PG&E to provide discovery.  On April 27, 2014, the District Court ordered

the depositions of Bonnett, Gankin, and the Fed. R. Civ. P. 30(b)(6) deponent to

proceed before a special master at PG&E's cost.  (EOR 195-198).

On October 1, 2014, the District Court ordered the parties to submit a joint

letter brief to Magistrate Judge Spero on all remaining discovery disputes.  (EOR

194).  After a day and a half of meeting and conferring in Judge Spero's courtroom,

on November 12, 2014, Judge Spero affirmed the parties' submission concerning

the plan for the resolution of the remaining discovery disputes in this case.  (EOR

190-193).  Thereafter, PG&E provided additional documents, interrogatory

responses in lieu of Fed. R. Civ. P. 30(b)(6) deposition testimony, and the

depositions of Gankin and Bonnett proceeded before a special master. (EOR 51-52, 58-68).

The depositions began with extended argument and colloquy by PG&E's counsel in direct violation of the District Court's Order and instructions for the deposition conduct. (SEOR 105-133). Pursuant to the District Court's briefing schedule, PG&E renewed its motion for summary judgment on January 23, 2015, essentially reasserting the same arguments and evidence. (EOR 158-194).

The system of discovery was designed to increase the likelihood that cases would be decided on the merits, not to promote principles of gamesmanship and deception in which the party who hides the ball most effectively wins the case. PG&E's lack of diligence in responding to requests for discovery is the equivalent of obstructing discovery. The summary judgment record demonstrates that PG&E engaged in evasive conduct that was prejudicial to the administration of justice.

**b.** **Examples of PG&E's Evasive Discovery Conduct at the Depositions of Gankin and Bonnett**

Gankin testified that he could not remember putting any other employees besides Ingram on crisis suspension and therefore could not give the reason they were put on crisis suspension without having the files in front of him. (EOR 413-414). Gankin refused to identify by initials or by name who he put on crisis suspension that did not have dark skin. (EOR 415-416). Gankin could not answer

17

how many employees he has disciplined for switching errors from 2010 to the present. (EOR 420). Gankin was instructed not to answer whether or not persons under his supervision were put on a DML. (EOR 404). Gankin was instructed not to answer questions about the disciplines of the African-American electricians. (EOR 405, 406). Gankin was instructed not to answer concerning the positions of the persons for whom he prepared termination letters. (EOR 410). Gankin refused to identify by initials or by name of any persons he put on a DML whom did not have dark skin. (EOR 417-418).

Bonnett was also instructed not to answer if all Martin substation workers that were placed on DML were African-American. (EOR 458-459). Bonnett was instructed not to answer whether or not he knew why Tinsley had sued PG&E. (EOR 447). Bonnett was instructed not to identify the four or five employees' names who had been terminated from the time he was lead substation supervisor at Martin. (EOR 453-454). Bonnett was instructed not to answer if the employees who have been terminated for work performance since 2005 were African-American. (EOR 456-457). This obstructive conduct materially prejudiced Ingram in his ability to obtain evidence of a pattern of race-based discipline at the Martin Substation of PG&E; however, the District Court did not issue any sanction for the repeated obstreperous conduct[9].

9 Due to PG&E's obstruction, Plaintiff was forced to bring Gankin back for

18

## V.   SUMMARY OF THE ARGUMENT

At summary judgment, Ingram presented triable issues of material fact as to the second and fourth prong of his *prima facie* Title VII Race Discrimination and FEHA claims under the *McDonnell Douglas* burden-shifting framework, as well as to pretext.

The District Court committed reversible error by dismissing Ingram's case as a matter of law at the *prima facie* stage where: (1) the District Court conflated Ingram's *prima facie* and pretext evidentiary burdens; (2) the second prong of his *prima facie* discrimination in discipline case should have been relaxed or merged with the fourth prong; and (3) there were triable issues of material fact present in the summary judgment record that Ingram performed his job satisfactorily.

While distinctly different evidentiary burdens govern the fourth prong and pretext, Ingram has presented triable issues of material fact under either prong: similarly-situated non-African-American PG&E employees who received more favorable treatment than Ingram, even though they committed infractions of comparable gravamen.  Accordingly, this Court should reverse and remand the District Court's grant of summary judgment to PG&E for further proceedings.

---

deposition five times, Bonnett two times, and to file no less than three discovery letters with the Court.

## VI. LAW & ARGUMENT

### A. STANDARD OF REVIEW

This Court reviews summary judgment decisions *de novo* and applies the same standards used by the District Court. *Carver v. Holder*, 606 F.3d 690, 695 (9th Cir. 2010) (citation omitted). Summary judgment is appropriate only if there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The grant of a motion for summary judgment is a drastic remedy and should be used with caution so as not to serve as a substitute for a trial on the merits." *Nelson v. A. H. Robins Co.*, 515 F. Supp. 623, 627 (N.D. Cal. 1981).[10]

This Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (citations omitted); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility

---

10  District Courts retain discretion to "deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.'" *Anderson*, 477 U.S. at 255; *see also Anderson v. Hodel*, 899 F.2d 766, 771-72 (9th Cir. 1990); *Safe Flight Instrument Corp. v. McDonnell-Douglas Corp.*, 482 F.2d 1086, 1093 (9th Cir. 1973) (finding no error in the district court's denial of a motion for partial summary judgment, and noting that "[t]he district court did not deny the motion because it was convinced that the motion was without merit, but because the issue presented was so complicated the court did not wish to dispose of it on a motion for partial summary judgment").

determinations, the weighing of the evidence, and the drawing of legitimate

inferences from the facts are jury functions, not those of a judge."); *see also*

*Taybron v. City & County of San Francisco*, 341 F.3d 957, 959 (9th Cir. 2003)

(holding that the district court erred in "weighing . . . the evidence and making

findings rather than focusing on whether genuine issues of material fact are in

dispute").

In *Reeves*, the United States Supreme Court instructed district courts to

disregard the testimony of interested witnesses at summary judgment:

> [A]lthough the court should review the record as a whole, it must disregard
> all evidence favorable to the moving party that the jury is not required to
> believe. That is, the court should give credence to the evidence favoring the
> nonmovant as well as that "evidence supporting the moving party that is
> uncontradicted and unimpeached, at least to the extent that the evidence
> comes from disinterested witnesses."

530 U.S. at 151 (citations omitted). Very little evidence is necessary to survive

summary judgment in a discrimination case "because the ultimate question is one

that can only be resolved through a searching inquiry - one that is most

appropriately conducted by the factfinder, upon a full record." *Schnidrig v.*

*Columbia Mach.*, 80 F.3d 1406, 1410 (9th Cir. 1996) (*quoting Lam v. University of*

*Hawaii,* 40 F.3d 1551, 1563 (9th Cir. 1994)) (internal quotation marks omitted).

Summary judgment is ordinarily inappropriate on "any grounds relating to

the merits because the crux of a Title VII dispute is the elusive factual question of

21

intentional discrimination." *Warren v. City of Carlsbad,* 58 F.3d 439, 443 (9th Cir. 1995), *cert. denied*, 516 U.S. 1171, 116 S. Ct. 1261, 134 L. Ed. 2d 209 (1996); *see also U.S. Postal Service Bd of Governors v. Aikens,* 460 U.S. 711, 716 (1983) (acknowledging that discrimination cases present difficult issues for the trier of fact, as "there will seldom be 'eyewitness' testimony as to the employer's mental processes").[11]

Viewing the evidence in the light most favorable to Ingram, this Court must reverse the summary judgment decision below to permit a jury to decide the genuine issues of material fact presented.

### B.   INGRAM PRESENTED TRIABLE ISSUES OF MATERIAL FACT AS TO HIS RACE DISCRIMINATION CLAIM.

An employer violates Title VII when it terminates an employee on the basis of his race.  *See* 42 U.S.C. § 2000e-2(a)(1).  Under the *McDonnell Douglas* framework, Ingram must establish a *prima facie* case of disparate treatment Race Discrimination by establishing each of the following: (1) that he belongs to a class protected by Title VII; (2) that he performed his job satisfactorily; (3) that he suffered an adverse employment action; and (4) that PG&E treated him differently

---

11  Because an employer is very unlikely to leave a "paper trail or 'smoking gun' attesting to discriminatory intent," a disparate treatment plaintiff must often "cumulatively undercut" defendants' proffered explanation by presenting an accumulation of  circumstantial evidence.  *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990); *accord Rosen v. Thornburgh*, 928 F.2d 528 (2d Cir. 1991).

than a similarly situated employee who does not belong to the same protected class as him. *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (*citing McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).

This appeal challenges the dismissal of Ingram's Race Discrimination and Wrongful Termination in Violation of Public Policy[12] claims. The District Court below acknowledged that the first and third elements on his *prima case* Race Discrimination case were undisputed. (*See* EOR 14-15).

### 1. The *McDonnell Douglas* Burden-Shifting Evidentiary Standard is Flexible.

Ingram must meet his *prima facie* burden "by coming forward with evidence that [PG&E] considered race in its employment decisions." *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Estate*, 470 F.3d 827, 837 (9th Cir. 2006) (*citing Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989) (superseded by statute on other grounds); *Johnson v. Transp. Agency*, 480 U.S. 616, 626 (1987).

Nonetheless, "the precise requirements of a prima facie case can vary depending on the context and were 'never intended to be rigid, mechanized, or ritualistic.'" *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002) (*quoting Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)); *see also McDonnell*

---

12  Ingram requests that this Court also reverse and remand his Wrongful Termination in Violation of Public Policy claim based on its derivative relationship to his Title VII claim. *See Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1118 (9th Cir. 2011).

*Douglas Corp. v. Green*, 411 U.S. 792, 802 n.13 (1973) ("The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.").

Establishment of a *prima facie* case under *McDonnell Douglas* creates a rebuttable inference that PG&E terminated him because of Ingram's race. *See Cornwell*, 439 F.3d at 1028 (*citing McDonnell Douglas*, 411 U.S. at 802). PG&E must then produce admissible evidence showing that termination was for a "legitimate, nondiscriminatory reason." *Id*. If successful, Ingram may then defeat this nondiscriminatory explanation with "specific" and "substantial" circumstantial evidence showing that the proffered reason is a pretext for discrimination, thereby creating a triable issue of material fact. *Id*. at 1029 (*citing Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998)).

Although frequently used, the *McDonnell Douglas* framework is not mandatory:

> [A]lthough the McDonnell Douglas burden shifting framework is a useful "tool to assist plaintiffs at the summary judgment stage so that they may reach trial," "nothing compels the parties to invoke the McDonnell Douglas presumption." [Citation.] Rather, when responding to a summary judgment motion, the plaintiff is presented with a choice regarding how to establish his or her case. [Plaintiff] may proceed by using the McDonnell Douglas framework, or alternatively, may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason more likely than not

24

motivated GTE.  [Citation.]

*McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (*quoting and citing Costa v. Desert Palace,* 299 F.3d 838, 855 (9th Cir. 2002)).  This foundation of mandatory authority contextualizes the reversible errors committed by the District Court below.

### 2.  This Court Should Overrule the Authority Upon Which the District Court Conflated Ingram's Evidentiary Burdens at Summary Judgment.

The District Court conflated Ingram's evidentiary burdens at the *prima facie* and pretext stages by importing the latter into the former.  "'The requisite degree of proof necessary to establish a prima facie case . . . on summary judgment is *minimal* and does not even need to rise to the level of a preponderance of the evidence.'"  *Aragon v. Republic Silver State Disposal, Inc.,* 292 F.3d 654, 659 (9th Cir. 2002) (emphasis in original) (*quoting Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir. 1994)); *see also Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1124 (9th Cir. 2000).

Yet the District Court ruled that Ingram "must produce '*substantial* evidence of satisfactory job performance sufficient to create a jury question on this issue.'" (EOR 15) (*quoting Douglas v. Anderson*, 656 F.2d 528, 533 n.5 (9th Cir.1981)) (emphasis added).   Apparently confusing the issue, the District Court then quoted

*Aragon*:

> At the *prima facie* stage, the plaintiff need not "eliminate the possibility that he was laid off for inadequate job performance," because such a requirement would "conflate the minimal inference needed to establish a prima facie case with the specific, substantial showing" required at the pretext stage of the *McDonnell Douglas* analysis.

(EOR 15) (*quoting Aragon*, 292 F.3d at 659). The District Court conflated Ingram's asymmetrical evidentiary burdens by disregarding evidence of Ingram's satisfactory job performance as "not the 'specific, substantial' showing [...] our cases require." (EOR 17).[13]

More recent Ninth Circuit authority than *Douglas* has reiterated that the "first and third stages [of the *McDonnell Douglas* analysis] must remain distinct because, '[t]o do otherwise would in many instances collapse the three step analysis into a single step at which all issues would be resolved.'" *Hawn v. Exec. Jet Mgmt.*, 615 F.3d 1151, 1158 (9th Cir. 2010) (*quoting Lynn v. Regents of the Univ. of Cal.*, 656 F.2d 1337 (9th Cir. 1981)). The *Hawn* Court noted that "[t]he difference between the first and third steps of the *McDonnell Douglas* framework is not without some consequence," partly because "a plaintiff's burden is much less at the prima facie stage than at the pretext stage." *Hawn*, 615 F.3d at 1158.

The *Douglas* decision cites no supporting authority that would require

---

13 The District Court declined to engage in a pretext analysis under *McDonnell Douglas*. (EOR 18).

Ingram to produce "substantial" evidence of his satisfactory job performance. *Douglas*, 656 F.2d at 533 n.5. The Ninth Circuit has not cited this point of law with approval in at least the half-decade since *Hawn*. Requiring "substantial" evidence in a plaintiff's *prima facie* summary judgment showing is contrary to *Aragon* and *Hawn*, both discriminatory discharge cases. *Aragon*, 292 F.3d at 657; *Hawn*, 615 F.3d at 1153. Accordingly, Ingram urges this Court to overrule this particular portion of *Douglas* as inconsistent with the Ninth Circuit's current proscription on conflating the non-moving party's *prima facie* and pretext evidentiary burdens at summary judgment.

### 3. There is a Triable Issue of Material Fact Whether Ingram Performed His Job Satisfactorily.

In the absence of a formal performance review process, and in light of the collective bargaining agreement covering discipline and termination, a PG&E electrician's performance can only be assessed by viewing the totality of the circumstances. Given the flexibility of the *McDonnell Douglas* framework, Ingram's first summary judgment opposition contended that if PG&E "applied its expectations against [him] in a discriminatory manner its expectations of performance the *McDonnell Douglas* prima facie elements must be adjusted." (EOR 351). The District Court correctly identified that "a flawless personnel file at all times during employment" is not necessary. *Bahri v. Home Depot USA, Inc.*,

27

242 F. Supp. 2d 922, 931 (D. Or. 2002) (EOR 15).  The *Bahri* Court further

elaborated:

> It would be fundamentally unfair to require plaintiffs to show that their
> employment files were devoid of negative reviews and write ups *after* illegal
> discrimination was interjected into their workplace particularly where, as
> here, plaintiffs allege that the discrimination manifested itself in unjustified
> warnings and unjustifiably low performance evaluation rankings. In short,
> the second element of the *prima facie* case makes sense only when it is
> limited to the time period *prior* to the introduction of the alleged unlawful
> discrimination.

*Bahri*, 242 F. Supp. 2d at 931 (emphasis in original).  There was no record before

the District Court that Ingram had any disciplinary record prior to being transferred

into the racially hostile environment supervised by Bonnett and Gankin.  (*See* EOR

126-146, 118).  Nevertheless, Ingram contends that the second prong of his *prima

facie* case should be relaxed or merged with the fourth prong.[14]

---

14  This comports with Seventh and Eighth Circuit discriminatory discharge cases
involving disparate punishment.  *Flores v. Preferred Technical Group*, 182 F.3d
512, 515 (7th Cir. 1999) (eschewing consideration of the second prong because it
made "little sense" to discuss it where the employer singled out the plaintiff, a
Hispanic female, for termination for an offense also committed by non-Hispanic
employees); *Oest v. Illinois Dept. of Corrections*, 240 F.3d 605, 612 n.3 (7th Cir.
2001) (finding the second prong was not necessary to the analysis where "the
people judging [the plaintiff]'s performance were the same she accused of
discriminating against her."); *see also Curry v. Menard, Inc.*, 270 F.3d 473, 478
(7th Cir. 2001); *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002)
("When a plaintiff produces evidence sufficient to raise an inference that an
employer applied its legitimate employment expectations in a disparate manner
(i.e., applied expectations to similarly situated [non-black] employees in a more
favorable manner), the second and fourth prongs of *McDonnell Douglas* merge—
allowing the plaintiff to establish a *prima facie* case, stave off summary judgment
for the time being, and proceed to the pretext inquiry."); *Perez v. Thorntons, Inc.*,

Even if this Court declines to do so, the District Court itself identified two facts within the summary judgment record which demonstrate that Ingram had been performing his job satisfactorily (*see* EOR 17): First, Ingram scored 92% of his substation switching course in 2010, and 100% in his termination year. (*See* EOR 148). Indeed, due to his 2011 score, "there was no coaching report that listed any areas of improvement." (*Id*.). Second, Ingram's supervisor assigned Rice, the Provisional Electrician, to Ingram for training purposes on May 17, 2011. (EOR 154). These facts alone should be sufficient under *Aragon* and *Hawn* to overcome the "minimal" barrier necessary to establish a triable issue of material fact.

At summary judgment, the District Court relied upon PG&E's hodgepodge evidence of previous switching errors and other disciplines occuring during a multi-year period to rule in PG&E's favor. (EOR 16) (*see also* EOR 126-146, 155-156). The District Court also noted the alleged failure to report his driver's license status, including his "less than complete and accurate" explanation. (*See* EOR 16).

PG&E's evidence merely reflects triable issues of material fact, especially

731 F.3d 699, 704 (7th Cir. 2013) ("In disparate punishment cases, like this one, the second and fourth prongs merge and are satisfied by a showing that a similarly situated employee outside the plaintiff's protected class committed a similar act but was subjected to less severe discipline."); *Davenport v. Riverview Gardens Sch. Dist.*, 30 F.3d 940, 944 (8th Cir. 1994) (holding that held that "by requiring plaintiff to disprove the alleged conduct violations in order to establish his prima facie case, the district court essentially required plaintiff, at the outset, to disprove defendant's alleged business reasons for its adverse employment action - in other words, to prove pretext and the ultimate issue of intentional discrimination.").

because Ingram's termination was based on the May 17, 2011 switching error and

the issues surrounding his driver's license.  (*See* EOR 122-123).  PG&E has a

three-part "Positive Discipline" policy trifurcated into (1) work performance, (2)

conduct, and (3) attendance categories.  (EOR 455).  The District Court

acknowledged that "[i]nstances of discipline in one category are not considered in

imposing discipline in a different category."  (EOR 5) (*citing* EOR 24, SEOR 134).

Hence, not all of Ingram's 11 disciplines for "performance and/or conduct" (EOR

126), including for parking tickets (EOR 126-146; *see also* EOR 16), are

substantively or temporally[15] relevant.  The governing collective bargaining

agreement made clear that these other alleged incidents and disciplines were not to

be considered cumulatively in the manner PG&E and the District Court did at

summary judgment.

 Moreover, switching errors are common at PG&E.  (EOR 289).  Despite an

imperfect[16] performance record, Ingram should have been permitted to present his

---

15  Oral and written reminders only remain active for six and 12 months,
respectively.  (EOR 264, 266).

16  The authorities relied upon by the District Court are inapposite to this case.  In
*Diaz v. Eagle Produce, Ltd.*, 521 F.3d 1201, 1206, 1208 (9th Cir. 2008), the Ninth
Circuit affirmed the dismissal of a farmer worker laid off in a reduction-in-force
partly because he "openly violated" company policy by running a side business
"over an extended period" despite unambiguous warnings from his supervisor.  *Id*.
*Diaz* does not resemble PG&E's uniquely nuanced positive discipline regime;
rather, it involved one employee intentionally repeating the same prohibited act
over and over again.  *Jackson v. Foodland Super Mkt., Ltd.*, 958 F. Supp. 2d 1133,

five years without discipline of any kind before being supervised by Gankin and Bonnett, his substation switching scores, and his training experience to the jury as evidence that he met the reasonable expectations of his employer vis-à-vis the collective bargaining agreement, particularly because PG&E never issued Ingram a formal performance evaluation. (*See* EOR 460).

Finally, the District Court usurped a traditional jury function by finding that the evidence shows "that if Plaintiff was unaware of the expiration date of his license, *it was because he remained purposefully unaware*." (EOR 10) (emphasis added). This is an improper judicial determination of Ingram's veracity, motive, intent, and credibility. *Reeves*, 530 U.S. at 150; *Anderson*, 477 U.S. at 255. This Court must reverse so that a jury may properly consider these issues.

### 4. There is a Triable Issue of Material Fact Whether PG&E Treated Ingram Differently than Similarly Situated Employees Outside of His Protected Class.

The concept of "similarly situated" employees is relevant both to the *prima facie* case and pretext, though "these inquiries constitute distinct stages of the *McDonnell Douglas* burden-shifting analysis." *Hawn*, 615 F.3d at 1158. It is true that Ingram must prove that he is "'similarly situated to [his comparators] in all

---

1139-40 (D. Haw. 2013) and *Pascual v. Astrue*, 2009 U.S. Dist. LEXIS 35936, *4 (N.D. Cal. Apr. 24, 2009) are also distinguishable because, despite the lack of performance evaluations, there was evidence on the summary judgment record that Ingram received excellent switchman course scores immediately prior to his termination, and that he was responsible for training another electrician.

material respects.'" *Beck v. UFCW, Local 99*, 506 F.3d 874, 885 (9th Cir. 2007)

(*quoting Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006)); *Vasquez v. Cty. of*

*L.A.*, 349 F.3d 634, 641 (9th Cir. 2003) ("[I]ndividuals are similarly situated when

they have similar jobs and display similar conduct."). Yet Ingram's comparators

need not "be *identically* situated" to him, e.g., having "the same supervisor, [being]

subject to the same standards, and [engaging] in the same conduct." *Bowden v.*

*Potter*, 308 F. Supp. 2d 1108, 1117 (N.D. Cal. 2004) (analyzing comparator

evidence in the context of the *prima facie* analysis). The *Bowden* Court explained:

> The relevance of such factors depends on the circumstances and nature of
> the case. The critical question is whether the plaintiff and the other employee
> are similarly situated in "all *material* aspects." [*McGuinness v. Lincoln Hall*,
> 263 F.3d 49, 53 (2d Cir. 2001)] (emphasis in original). For instance, an
> employee on an assembly line who physically assaults a co-worker is
> similarly situated to a supervisor who engages in similar conduct. A worker
> in the sales department who steals company property is similarly situated to
> one who works in customer service and commits the same act. The ultimate
> question that is informed by the similarly situated analysis is whether there is
> a basis for inferring discriminatory motive: Does the purported purpose of
> the challenged action require similar treatment of the two employees or does
> it justify different treatment due to differences in their status or situation
> rather than race? In the above examples, the fact that one employee is a
> supervisor or works in a different department is irrelevant to the purpose of
> the discipline. In other situations, those differences may be relevant. The
> issue of similarly situated status is therefore fact specific and defies a
> mechanical or formulaic approach. This is particularly so in view of the
> overarching predicate as to the relevance of the *McDonnell Douglas* test in
> the first place; as noted above, it is merely one method by which an
> inference of unlawful discrimination may be raised. *See Vasquez,* 349 F.3d
> at 640.

*Id*.

The summary judgment record reflects employees similarly-situated to Ingram who committed switching errors but were not disciplined. Since 2008, only two individuals were terminated, either in whole or in part, for switching errors; both were African-Americans reporting to Gankin and Bonnett. (EOR 249-251). During this same time period, numerous employees were involved in switching errors and received no discipline at all[17]. Furthermore, since 2008, only four employees have been placed on Crisis Suspensions, including Ingram and his two African-American co-workers, each of whom had formally complained of race discrimination against Bonnett and Gankin. (EOR 232-233, 252-254, DEF 3529-3530).

The District Court erred by accepting PG&E's contorted interpretation of Ingram's comparator evidence and focusing on his allegedly worse record of negative discipline and driving violations. (EOR 15). As previously noted, the CBA-governed positive discipline system is trifurcated into mutually exclusive categories with express time limits on how long oral and written disciplines remain active. Accordingly, it is inappropriate for the District Court to perform a comparative analysis of Ingram's cumulative work record when PG&E ostensibly

---

17  *See* EOR 218 (*citing* DEF 00263-00264); two other serious performance errors occurred within a three-week period, other than Ingram's. (EOR 226-227, 233, 247-248).

33

would not have been able to do so under the circumstances of Ingram's termination.

Accordingly, the District Court's cited authorities are inapposite to the present matter. "*When warranted by the circumstances*, an employer may discipline repeat offenders more severely than first-time offenders." *Wall v. Nat'l R. Passenger Corp.*, 718 F.2d 906, 909 (9th Cir. 1983) (emphasis added). *Wall* considered a CBA-driven disciplinary procedure of an employee engaged in repeated and potentially violent conduct. (*Id*. at 908). Yet, unlike here, nothing in the decision suggests that the employer was contractually prohibited from considering the plaintiff's cumulative work record.

Likewise, the point of law cited by the District Court from *Aragon* (*see* EOR 18) is off-point for two reasons: First, the *Aragon* Court considered the comparator evidence in light of the "substantial" and "specific" standard of the pretext, not the *prima facie*, analysis. *Aragon*, 292 F.3d at 663-64. Second, on this point of law, *Aragon* considered "me too" rather than comparator evidence. Accordingly, these cases are inapposite and this Court should reverse and remand the District Court's grant of summary judgment to PG&E.

### 5. There is a Triable Issue of Material Fact as to Pretext.

Under *McDonnell Douglas*, if an employee presents *prima facie*

34

circumstantial evidence of discrimination, the burden shifts to PG&E to "produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.'" *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). Should PG&E carry this burden, Ingram must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by PG&E were not its true reasons, but were a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). This burden-shifting scheme is designed to assure that the "plaintiff [has] his day in court despite the unavailability of direct evidence." *TWA v. Thurston*, 469 U.S. 111, 121 (1985) (alteration in original) (citation and internal quotations omitted). Ingram presents the following substantial and specific evidence that creates triable issues of material fact for a jury:

### a. Ingram Personally Observed Gankin Disparately Punish African-American Co-Workers.

Prior to being terminated, Ingram believed race was a factor in his disciplines because he had witnessed his supervisor, Gankin, severely discipline and admonish all of the African-Americans who reported to him (Tinsley, Andre Walker, and Lonell Coverson) concerning minor offenses and performance errors for which Ingram's Caucasian co-workers were never admonished or disciplined. (EOR 120).

35

### b.    Only African-Americans Were Terminated for Switching.

The discipline summaries that PG&E initially produced contained redactions with no unique numerical identifiers.  (EOR 53).  Ingram had to file a motion to get the information using unique numerical identifiers and a list of the race of the electricians based upon their unique numerical identifiers.  (EOR 512-521).

On October 29, 2014, PG&E finally addressed a scaled-down version of a category of information concerning who was terminated for switching errors, without any possibility of follow-up questioning of the Fed. R. Civ. P. 30(b)(6) deponent.  (EOR 52-53, 69-74).  That document, correlated with a key indicating the race of the individual identifiers, demonstrates that only two individuals were ever terminated for switching and both were African-American: Ingram and Employee # 18.  These documents also demonstrate that a Caucasian comparator, Employee # 139, was not terminated for a switching error of similar gravamen, but rather received a DML, that may or may not have been reduced at a later date. (*Id.*).  Ingram was precluded by PG&E's discovery tactics from knowing about this comparator for two years.

### c.    All African-American Electricians at the Martin Substation Were Placed on DMLs or Terminated.

Beginning in December 2012, Ingram sought the employee performance

36

records of other Substation Maintenance Electricians that worked at Martin

Substation under Gankin and Bonnett.

When PG&E first produced the employee performance records, it did so in a

fashion that precluded Ingram from correlating the race and identity of the

employee.  (EOR 54-55).  Therefore, Ingram was unable to gather any useful

information for PG&E's production.  After he moved to compel, PG&E provided

supplemental responses on October 29, 2013.  (EOR 58-68).  In this production,

PG&E produced a subsequent and altered production of documents (SEOR 1-35),

which contained unique numerical identifiers, thus giving Ingram an opportunity to

analyze the disciplines received by his comparators.  At this time, PG&E also

produced a key identifying the race of each redacted employee.

When PG&E finally produced summary documents of disciplines that could

be correlated, it was evident that all of the African-Americans were disciplined at

the highest level before termination (SEOR 1-35) and termination.  (EOR 69-74).

In its October 29, 2015 production, PG&E produced documents concerning

Employee # 16, which Ingram identified as being singled out, reprimanded, and

disciplined for conduct for which the previous Caucasian electrician was not

disciplined.  (EOR 120).  All of these African-American employees were long-

tenured employees who did not have histories of significant discipline prior to

37

reporting to Gankin.

### d. No Positive Recognitions Given to African-American Employees by Gankin

After Ingram's Motion to Compel, PG&E produced a subsequent and altered

production of documents on November 6, 2013. (EOR 54-55; SEOR 1-35). Those

documents demonstrate a striking pattern in the issuance of positive recognitions

by Bonnett and Gankin: not a single positive recognition issued to an African-

American electrician, and scores of positive recognitions issued exclusively to the

non-African-Americans. (EOR 54-56, 87-91; SEOR 1-35).

### e. Multiple Complaints of Race Discrimination at Martin Substation

Beginning in December 2012, Ingram sought the complaints of race

discrimination of employees at Martin Substation under Gankin and Bonnett. Over

the next year, PG&E refused to produce responsive documents. After Ingram

successfully compelled further discovery, PG&E provided a supplemental response

in January 2014. (SEOR 36-97). In this production, PG&E produced employee

complaints of race discrimination involving Gankin. PG&E produced two of

Ingram's African-American co-workers who filed either EEO complaints or

lawsuits for race discrimination. (SEOR 36-77). Another EEO complaint by a

Martin administrative worker identified racial animus against African-Americans

38

by Gankin.  (SEOR 78-97).

On February 13, 2009, Redacted Employee # 46 filed a complaint alleging race discrimination against Gankin.  (SEOR 37).  The complaint was prompted after multiple cases of discriminatory conduct against her, including threats of termination and denial of promotions.  In January 2009, Employee # 46 applied for an open Operating Clerk position at Martin Substation.  She expressed concern that Employee # 48, # 49 (one of which is Gankin) would prevent her from obtaining the job.  (*Id*.).

In or around June 18, 2010, Ingram's African-American co-worker (Employee # 16) called Human Resources to complain about the excessive positive disciplines he received from Employee # 48.  Employee # 16 alleged that he received numerous disciplines for minor infractions while others who committed similar infractions are not disciplined.  (SEOR 79-80).  On July 22, 2009, he received a DML in the work performance category.  (*Id*.).  He appropriately took this excessive discipline through the grievance process, where his DML was reduced to a Written Reminder.  The delay in modifying the DML to a written reminder resulted in a missed promotion opportunity for which he was the top bidder.  (*Id*.).

Employee # 16's chief concern was that Gankin excessively disciplined him

in a effort to have cause for termination. In April and May 2010, Gankin's actions accelerated, resulting in disciplines for three incidents which were minor and able to be explained. On May 17, 2010, he was placed on a Crisis Suspension with pay due to three instances which also coincidentally corresponded with another missed opportunity at becoming a Crew Foreman. (SEOR 85).

Also on August 3, 2010, Ingram's African-American co-worker, Tinsley (Employee # 18), filed a complaint of race discrimination with the California Department of Fair Employment and Housing against PG&E. Tinsley complained that he was terminated in retaliation for complaining of racial harassment and discrimination after being assaulted by his non-African-American supervisor. (*See* SEOR 36-77). Tinsley was terminated by PG&E on October 22, 2009. (*See id.*). Tinsley complained that between June 29, 2009 and July 21, 2009, he went from having no disciplinary issues (since October 1980) to having four write-ups. (*See id.*).

Often, circumstantial evidence of race as a factor in disciplines is presented in the form of "me too" evidence, which allows Ingram to present testimony of other employees to demonstrate that an employer discriminated against similarly situated individuals. The United States Supreme Court in *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. 379 (2008) provides that "me too"

40

evidence can be considered when deciding if Ingram's discipline conformed to a pattern of discrimination. *See also Obrey v. Johnson*, 400 F.3d 691 (9th Cir. 2005); *Heyne v. Caruso*, 69 F.3d 1475 (9th Cir 1995) (holding "me too" evidence "is relevant and probative of [the defendant's] general attitude of disrespect toward his female employees, and his sexual objectification of them," while noting is especially probative "because of the inherent difficulty of proving state of mind.").

### f.  Caucasian Placed on DML Reduced by Positive Recognitions Denied to African-Americans

PG&E's October 29, 2014 production which provided some of the underlying documents related to disciplines of Martin Substation electricians identifies Caucasian Employee # 2 as an individual facing a DML for a motor vehicle accident. (EOR 107). However, the "safety record" formed at least a portion of the basis of reducing the DML to a written reminder. (EOR 114). That "safety record" was documented in Positive Recognition issued by Gankin. (EOR 87-91; SEOR 1-35). The District Court overlooked this pattern of awarding positive recognitions only to non-African-Americans, which could then be used to mitigate discipline associated with a switching error or motor vehicle accident.

### g.  Corporate Security and EEO Investigations of Race Harassment

Bonnett testified that he initiated an EEO Investigation and called Corporate

41

Security concerning what he perceived to be graffiti on the Martin Substation

whiteboard in at least two incidents, wherein "Free Louie" was posted in the time

period around the termination of Tinsley (EOR 57; SEOR 98-102 ), and "I work

for the FBI" with the "FBI" crossed out and the acronymn "KGB" in its place.

(EOR 57; SEOR 103-104).   PG&E obstructed Ingram's discovery into these high-

probative instances of racially-based hostility in the workplace (EOR 57), and the

Court did not consider them at summary judgment.  (EOR 18).

### h.    No Co-Workers Disciplined For Drivers License Issues

PG&E's sworn interrogatory response provided on October 29, 2014

concerning the discipline of others for changes in their driver license status

continued the parsed, evasive responses which characterized PG&E's discovery

conduct; i.e., making no mention of the Caucasian testified to by Ingram—Chris

Hackworth—who was picked up for work when his licensure was in question.

(EOR 52, 61-62).  PG&E disclaimed any knowledge of any other loss of driving

privilege.  (*Id*.).

### i.    PG&E Did Not Follow Its Own Procedures

Moreover, the normal procedure for the type of switching Ingram was

engaged in in May 2011, would be to have someone with more experience than

Ingram to assist him with the switching, rather than have a novice assistant,

especially since this was the first time Ingram was performing this switching

operation. (EOR 247-248).

### 6. The District Court Engaged in Impermissible Credibility Determinations

"Employment discrimination cases inevitably present difficult problems of

proof, precisely because we cannot peer into the minds of decision-makers to

determine their true motivations." *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090,

1100 (9th Cir. 2005). *See also Artega v. Brink's, Inc.*, 163 Cal. App. 4th 327, 342

(2008) (noting that plaintiffs rarely produce direct evidence or "smoking gun"

evidence of discrimination). "Findings of fact should be eschewed in determining

whether summary judgment should be granted." *Taybron*, 341 F.3d at 959 n.2.

### a. Gankin's Evasive Testimony Regarding His Knowledge of Race in Discipline At Martin Substation

Gankin was questioned extensively about his understanding of race at Martin

Substation, as well as his understanding of how he issued disciplines and for what

reasons he rewarded recognitions. Gankin maintained throughout his five

depositions that he does not know what individuals' races are (SEOR 123) and that

he does not know what race is. (SEOR 126). Gankin's incredible testimony that he

does not know what race is could lead a reasonable juror to doubt his credibility

and disregard all his testimony. Despite the irrefutable statistics, Gankin testified

43

that he disagreed that he disciplined the African-American employees more frequently and more harshly than any other employee. (SEOR 114).

Gankin, despite being the subject of three investigations, also testified that he had no knowledge that other complaints were filed against him. Concerning Tinsley's complaint against him, Gankin testified that prior to Ingram's termination, he had no knowledge that Tinsley had complained that Gankin was considering race when disciplining employees. (SEOR 124). Gankin's response to this question was severely limited by the conduct of PG&E's counsel throughout Gankin's five depositions. Gankin also testified that he did not believe that his termination of Tinsley caused any division in his department and testified that he never had any conversations of this nature. (SEOR 109-112).

Similarly, Gankin alleges that he was not aware of another employee's complaint which alleged race discrimination and harassment against him individually. (SEOR 118). Gankin also denied knowledge of Employee # 16's complaint alleging race discrimination against him. (SEOR 127). Concluding the analysis of Gankin's understanding of race complaints prior to Ingram's termination, Gankin ultimately testified that he was aware of Tinsley's lawsuit but did not know the nature of the action and thus, Gankin was unaware of any complaints from his subordinates regarding race discrimination at the time he made

44

the recommendation for Ingram to be terminated. (SEOR 127-128).

Concerning Ingram, Gankin was instructed not to answer when asked if he is aware that Ingram alleged that he disciplined African-American employees unfairly. (SEOR 116-117).

In conclusion, Gankin did not feel as though his actions created any sense of ill-will in his department. Gankin was unaware of any issues or race in his department, primarily on the basis that he testified that he does not know could not identify employees by race. The District Court gave no weight to this evidence and implicitly resolved the issue of Gankin's credibility against Ingram.

> **b.** **Bonnett's Evasive Testimony Regarding His Knowledge of the Pattern of Race Based Disciplines in Conjunction With Plaintiff's Substantial and Specific Circumstantial Evidence Dictates A Trial On the Merits**

While Bonnett's name is not attached to the majority of the disciplines presented through the employee performance logs by PG&E, Bonnett did accept responsibility in both the issuance of disciplines and recognitions. Bonnett did not separate himself from Gankin's discipline and recognition pattern but instead testified: "Any discipline is approved, like I mentioned earlier, by HR and our superintendent. You are going to have three or four different people that are going to agree with what you are going to do, what level. Same with the recognition, we

all agree that he did a fine job, give him a recognition. Q. And there would be an e-mail documentation of these disciplines to the ones that you testified don't do along, you go through human resources? A. Correct." (EOR 81). PG&E produced scant numbers of e-mails concerning disciplines issued to Ingram's co-workers despite there being in excess of 100 disciplines and recognitions issued just by Bonnett and Gankin in PG&E-produced employee performance logs. (EOR 87-91; SEOR 1-35).

Beginning with Tinsley's EEO complaint, Bonnett testified that he did not remember that Tinsley made an EEO complaint against him. (EOR 82, 272:8-22). Bonnett further testified that at his deposition, on February 18, 2015, he learned for the first time that Tinsley had filed a complaint against Gankin alleging harassment. (EOR 83).

Bonnett did testify that he was at least partially aware of Serano's complaint which alleged race discrimination. (EOR 84). Bonnett testified that he remembers her complaint being about her work performance and her transfer to Concord, but does not recollect the complaint being about race. (EOR 84). The District Court gave no weight to this evidence and implicitly resolved the issue of Bonnetts's credibility against Ingram.

46

### C. THE DISTRICT COURT SHOULD HAVE MADE AN ADVERSE INFERENCE BECAUSE OF PG&E'S DISCOVERY MISCONDUCT.

Ingram requested that the District Court issue an adverse inference against PG&E concerning his comparators based on its above-described discovery misconduct and therefore deny summary judgment. (EOR 45). For more than two years, PG&E confounded Ingram's search for documents related to other complaints of race discrimination, comparators' disciplines, and the knowledge, intent, and motive of the decision-makers. Beginning in December 2012, Ingram began taking the depositions of his supervisors, Gankin and Bonnett, and specifically inquired about their knowledge of race issues and disciplines. This discovery proved to be central in demonstrating the systemic nature of over-discipline of African-American employees at Martin Substation being placed on DMLs and terminated.

PG&E's conduct during the depositions of the supervisors caused a delay of nearly 26 months in completing the depositions. Gankin's deposition was concluded after five separate sessions in February 2015. Likewise, Bonnett's deposition was concluded in February 2015 after two sessions. Both depositions were presided over by a special master beginning in January 2015, at PG&E's cost.

The manner in which discovery occurred demonstrates that a decision on the

47

merits in this case requires a factual analysis of a complexity inappropriate for summary judgment resolution. *See John Blair & Co.v. Walton*, 47 F.R.D. 196, 198 (D. Del. 1969) ("facts were complicated and the court was faced with 'lengthy affidavits,' numerous documents and 'voluminous depositions'"); *Flores v. Kelley*, 61 F.R.D. 442, 445-47 (N.D. Ind. 1973). This matter also resembles other cases where pragmatic considerations of efficiency and fairness counsel against granting summary judgment. *See In re Franklin Nat'l Bank Sec. Litig.*, 478 F. Supp. 210, 223 (E.D.N.Y. 1979) ("'slight unfairness'" in denial of summary judgment was "'more than overbalanced by advantages to all of the other litigants and the court system itself in more expeditious and fairer disposition of the whole dispute'"); *Forest Hills Early Learning Ctr., Inc. v. Lukhard*, 728 F.2d 230, 233, 245 (4th Cir. 1984) (upholding denial of summary judgment because although summary judgment could have been granted, there were "'critical inadequacies' in the record" and it was appropriate to allow intervention of other interested parties before deciding summary judgment); *Veillon v. Exploration Servs., Inc.*, 876 F.2d 1197, 1200 (5th Cir. 1989) (finding no error in refusal to grant a motion for summary judgment because "[a] district judge has discretion to deny a Rule 56 motion even if the movant otherwise successfully carries its burden of proof if the judge has doubt as to the wisdom of terminating the case before a full trial").

The particular facts of this case and its procedural history dictate that a trial on the merits is essential. PG&E's pattern of obstructing discovery while basing its summary judgment motion upon the elusive issues of motive and intent requires that summary judgment be denied as a sanction for misconduct.

An adverse inference is an equitable device that serves the remedial purpose, "insofar as possible, of restoring the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence," or failure to produce evidence, by the opposing party. *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). As the Court observed in *Residential Funding Corp. v. Degeorge Financial Corp*., 306 F.3d 99, 108 (2d Cir. 2002), the adverse inference "provides the necessary mechanism for restoring the evidentiary balance. The inference is adverse to the destroyer not because of any finding of moral culpability, but because the risk that the evidence would have been detrimental rather than favorable should fall on the party responsible for its loss." *Id*. at 108 (citation omitted). An adverse inference is available not only where the evidence at issue has been destroyed, but also where it has not been timely produced, or not produced at all. In such situations,

> the party seeking the instruction must show (1) that the party having control over the evidence had an obligation to timely produce it; (2) that the party that failed to timely produce the evidence had "a culpable state of mind"; and (3) that the missing evidence is "relevant" to the party's claim or defense

49

such that a reasonable trier of fact could find that it would support that claim or defense.

*Id*. at 107. Ingram has carried has burden as to each of these three prongs and, accordingly, an adverse inference instruction will be given to the jury. This Court therefore should impose the sanction of applying an adverse inference concerning Ingram's comparators, thus denying PG&E's motion for summary judgment as to his Race Discrimination claim.

## VII. CONCLUSION

Based on the foregoing, Ingram respectfully requests that this Court reverse and remand the District Court's summary judgment decision for further proceedings, with an instruction that an adverse inference be drawn against PG&E.


Respectfully submitted this 6th of October, 2015   SMITH PATTEN

*/s/ Dow W. Patten*
SPENCER F. SMITH, ESQ.
DOW W. PATTEN, ESQ.
Attorneys for Plaintiff-Appellant
STEVEN INGRAM

**Statement of Related Cases for Appeal No. 15-16069**

Pursuant to Circuit Rule 28-2.6 of the Rules of the United States Court of

Appeals for the Ninth Circuit, Appellant states that he is unaware of any related cases

pending in this Circuit.

Respectfully submitted this 6th day of October, 2015.          SMITH PATTEN

                                                              *s / Dow W. Patten*
                                                              Spencer F. Smith, Esq.
                                                              Dow W. Patten, Esq.
                                                              Attorneys for Appellant
                                                              Steven Ingram

Case: 15-16069, 10/06/2015, ID: 9709311, DktEntry: 9, Page 62 of 63

**Form 6.     Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements**

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

☒ this brief contains <u>11,430</u> words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

☐ this brief uses a monospaced typeface and contains_____ lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

☐ this brief has been prepared in a proportionally spaced typeface using *(state name and version of word processing program)* _____ *(state font size and name of type style)* _____ *, or*

☐ this brief has been prepared in a monospaced spaced typeface using *(state name and version of word processing program)* _____ with *(state number of characters per inch and name of type style)*

_____.

Signature | /s/ Dow W. Patten

Attorney for | Plaintiff-Appellant Steven Ingram

Date | 10/06/2015

Case: 15-16069, 10/06/2015, ID: 9709311, DktEntry: 9, Page 63 of 63

| 9th Circuit Case Number(s) | 15-16069 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | October 6, 2015 | .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/ Dow W. Patten |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) | | .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) | |